Argued April 4, reversed and remanded May 1, rehearing denied May 22, 1928.

## LYDIA EZMA FORSYTH *v.* CHARLES E. FORSYTH.

### (266 Pac. 907.)

**Deeds—Evidence Held to Show That Husband Delivered Deed of Property to Wife.**

1. In divorce suit in which property rights were involved, evidence *held* to show that husband delivered deed of mining property to wife.

**Divorce—Wife Held Entitled Under Evidence to Divorce on Ground of Cruel and Inhuman Treatment.**

2. In suit for divorce on ground of cruel and inhuman treatment, wife *held* entitled to divorce under evidence.

**Divorce — Wife to Whom Husband, Worth Approximately $40,000, had Conveyed Mining Property, Held Entitled, on Obtaining Divorce, to $5,000 Alimony and $600 Attorney's Fees.**

3. Where husband was worth approximately $40,000 and owned bonds and securities aggregating $23,400, wife, to whom husband had conveyed certain mining property, *held* entitled, on obtaining divorce, to alimony in sum of $5,000 and $600 as attorney's fees.

Divorce, 19 **C. J.**, p. 142, n. 52, p. 268, n. 90.

From Josephine: C. M. THOMAS, Judge.

Department 2.

REVERSED AND REMANDED.  REHEARING DENIED.

For appellant there was a brief over the name of *Messrs. Reames & Reames,* with an oral argument by *Mr. A. E. Reames.*

For respondent there was a brief and oral argument by *Mrs. V. A. C. Ahlf.*

BELT, J.—This is a story of a shattered romance in which the final chapter was written in the divorce

court. It is one teeming with human interest. Indeed the case affords a character study seldom found in cold records. Plaintiff and defendant were married at Seattle, Washington, June 26, 1914, after an engagement extending over a period of one year. The woman is a person of more than ordinary refinement and education. She is a graduate from the University of Washington and at one time was superintendent of an eleven-room school in Seattle. At the time of her marriage she was thirty-eight years of age and her husband sixty-seven. This was her first matrimonial venture while the defendant had a former wife, who died in 1909. Both of these parties seemed to be lovers of nature and of the great outdoors and had often gone on mountain climbing expeditions together. The woman is of a supersensitive type, occasionally bordering on the hysterical. The man is an eccentric character—cold, indifferent and determined. At the time of his marriage he was worth approximately $20,000 and had had considerable experience in business enterprises. He was given to speculation in the development of various mining properties.

Each party has charged the other with cruel and inhuman treatment and in reliance thereon has prayed for a decree of divorce. No children were born as a result of the marriage. Property rights, however, are involved. Hearing was had before the official court reporter appointed by the trial court as referee. After the testimony was extended and filed with the clerk, a decree was entered by the lower court dismissing the suit. From this decree the plaintiff appeals.

After the marriage the parties left for their home, known as the Ruble mine, in a somewhat isolated and

sparsely settled section of Josephine County. It is about four miles to the railroad station and postoffice. The house upon this mining property was old, dilapidated and meagerly furnished. No running water was piped to it although a spring was close by. There was only one kerosene lamp to furnish light. There were no musical instruments, phonograph or radio. It was a home you would not expect to see in view of the financial standing and intelligence of the people who lived in it. In the daytime the defendant often spent his time in walking about the premises. He was seldom seen without his gun which he had been in the habit of carrying for many years. At night the defendant generally played solitaire while his wife was left to her own thoughts. There were days in which they never spoke. For many years it was the custom of the defendant to keep an itemized account of every expenditure. About a month after the marriage we find this significant entry made by the wife in the account-book, "Stamps, my lord, 35¢." A few days later another entry made by her: "Stamped envelopes, sir, 50¢." At the end of the year the total expenses as shown by this book amounted to $2,028.66, after which, in the handwriting of the husband, are found these words: "Must be less next year." There are many items, however, which could not be properly classified under household expenses.

This man was generally kind to animals. In the winter months he would spend as much as $30 to feed them. Yet he apparently was cruel to his neighbors' cattle, as he kept a pile of rocks near his house with which to stone them. On one occasion he broke the leg of his neighbor's cow by hitting her with a rock.

His wife says that at such times the air was blue with profanity.

In some respects he was miserly. He wore one coat for thirty-five years and when he decided finally to burn it was careful to save the interlining which he brought to his wife to keep. He upbraided his wife quite severely for breaking an old can opener which had been in the home for a great many years. Again he unduly criticised her for breaking the top off of an old coffee-pot.

His wife was startled by a snake in the yard near by and when she screamed he said, "You damned old bitch—you let that snake get away." He made sneering remarks about "school-marms." When the plaintiff's health had become impaired and she left for a visit to her brother, a practicing physician in Seattle, the defendant addressed letters to her in the name of "L. E. Lovering"—her maiden name—causing her much humiliation and embarrassment.

L. M. Rober, a distinterested and very convincing witness who lived near the Forsyth home for many years, thus portrays the defendant:

"Well, Mr. Forsyth is a very peculiar man, he is a disbeliever, he does not believe in the Scriptures, he is an infidel, I think they call it. He would use profane language and he would often speak very disrespectful about the birth of Christ, and so forth, and he was very vile. He was very disrespectful to her and it hurt her. She was a believer in the teachings of the Bible, and she didn't like to have him talk that way and it was very annoying to her and I would say that it was a very vile and coarse thing to do to mistreat Mrs. Forsyth that way. He would call her and he did call her in my presence a 'hussy' and that she was a school teacher, and that she could not run him or his daughter and he would call her that in my pres-

ence.    And he also said before that, he spoke about
that same thing that she was running away with one
of her former lovers and was living with him and
that she had left him as his wife.    These were very
unpleasant things for Mrs. Forsyth to hear about and
it injured her greatly."

1. On the day before the marriage, as an expression
of his love and affection, the defendant had a deed
prepared conveying to his bride the Ruble mine,
which instrument is designated in the record as Ex-
hibit "A."    The wife testified that this deed was de-
livered to her about a week after the marriage and
that she placed it among other papers in her trunk
for safekeeping.    When the deed was given to her she
said that her husband stated:

"I have speculated a great deal in mining stock and
have lost probably thirty thousand dollars in mines.
I may in the future speculate * * and lose other sums
of money.    This deed here that I give you will be a
deed to you and for as long as you live the income
will support you even though I should lose everything
else that I have."    He said, "You know how it is,
'kid,' I want it to appear to be in my name as long
as I live," but he said, "In the event that anything
happens to me, as quick as the Lord will let you, put
that on record."

The defendant in referring to this deed, in response
to the question: "What is the understanding in refer-
ence to the deed?" answered, "That if I died she was
to record the deed."    At this juncture it may be said,
however, that the defendant claims that the deed never
left his possession and that there was no delivery of
it.    We think his testimony in this respect is not true.
His own admissions are utterly inconsistent with this
contention.    The wife placed this deed in her trunk
and kept it there for a period of about ten years.    In

May, 1924, she found the instrument on the bed and discovered that her name as grantee had been cut out of it.   When she asked him why he had done this he made some explanation about changing his mind and threw the deed in the stove.   There was no fire burning and she was able to rescue it.

On cross-examination the defendant was asked concerning a transaction under consideration for the sale of the mine.   He stated in substance that he had acquired title to the property by adverse possession. Of course, it is absurd that the title of his wife could thus be divested.   We are convinced that the defendant intended to and did deliver the deed to his wife. It is equally well established that he cut her name out of the instrument under circumstances that reflect no credit upon him.   It was a mean and contemptible act.

2. It would greatly extend this opinion were we to relate in detail the many little acts portraying the home life of these parties.   The record has been closely studied and analyzed and it is our opinion that plaintiff's charge of cruel and inhuman treatment has been established by the preponderance of the testimony.   She did not marry the defendant for money. While at times, on account of her highly nervous temperament, she probably would have strained the patience of most men, it is believed that she was truly in love with the defendant and was a faithful and dutiful wife.   She was literally starving for love and affection.

3. Plaintiff is entitled to a decree of divorce and to an equitable division of the property.   At the time of the trial defendant testified he was worth approximately $40,000.   It is decreed that plaintiff is the owner

in fee of the property described in the deed of convey-
ance designated in the record as Exhibit "A." The
value of this mine is speculative and uncertain but
for many years the parties, under a lease, have col-
lected royalties amounting to approximately $2,000
per year. In the answer, bonds and securities owned
by the defendant, aggregating $23,400, are listed. We
think it fair and equitable that, in addition to the
mining property above stated, plaintiff be awarded ali-
mony in the sum of $5,000 and the further sum of $600
as attorney fees herein. Plaintiff will recover costs
and disbursements.

The decree of the lower court dismissing this suit
is reversed and the cause remanded, with directions
to enter a decree not inconsistent herewith.

REVERSED. REHEARING DENIED.

RAND, C. J., and BEAN and BROWN, JJ., concur.